IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID DOMINICK, | ) | CASE NO. 1:13CV00975 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL, | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff David Dominick ("Plaintiff" or "Dominick") challenges the final decision of

Defendant Carolyn M. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying his applications for supplemental social security income ("SSI") and disability insurance

benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act . Doc. 1. This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the

undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

Dominick filed applications for SSI and DIB on August 7, 2006, alleging disability as of

May 24, 2006. Tr. 214-221. Dominick alleged disability based on blindness in his left eye and

spinal damage resulting from a motorcycle accident. Tr. 247. His applications were denied by

the state agency initially (Tr. 136-141) and on reconsideration (Tr. 144-149). On February 9,

2009, a hearing was held before Administrative Law Judge Peter Beekman ("ALJ"). Tr. 75-101.

On April 2, 2009, ALJ Beekman determined that Dominick's residual functional capacity ("RFC") did not prevent him from performing work existing in significant numbers in the national economy, i.e., he was not disabled. Tr. 122-135.   On April 23, 2009, Dominick requested review of the ALJ's decision by the Appeals Council (Tr. 161-63) and, on February 20, 2010, the Appeals Council remanded his claim.  Tr. 117-121.

On September 16, 2011, a new hearing was held before ALJ Beekman.  Tr. 44-74.  On December 28, 2011, the ALJ again denied Dominick's claim for benefits and determined he was not disabled.  Tr. 17-43.  Dominick requested review of the 2011 decision by the Appeals Council.  Tr. 7-13.  On March 20, 2013, the Appeals Council denied Dominick's request for review, making the ALJ's 2011 decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.  Personal and Vocational Evidence

Dominick was 45 years old on his alleged onset date and 50 years old on the date of the hearing.  Tr. 44, 241.  He worked as a machine operator from 1996 until he was laid off from that position in 2001.  Tr. 28, 260, 493.  Since at least 2006 through 2012, Dominick reported that he volunteered 20 to 25 hours a month providing transportation to residents at a nursing home.[1]  Tr. 395, 403, 438, 467, 993, 1008.

---

[1] At the September 16, 2011, administrative hearing, Dominick reported that he had stopped volunteering prior to the hearing but did not recall when.  Tr. 47-48. However, treatment notes from 2012 continued to reflect that he worked 20-25 hours per month at the nursing home.  Tr. 993, 1008.

**B.  Relevant Medical Evidence[2]**

**1.  Treatment Notes**

    **a.  Metro Health Providers**

    <u>Dr. Hitchcock.</u>  Prior to his alleged onset date, on September 7, 2005, Dominick was referred to Candia Hitchcock, Ph.D. for a neuropsychological report.  Tr. 354-59.  He reported to Dr. Hitchcock that he had experienced a traumatic brain injury ("TBI") from a motorcycle accident in 1982.  Tr. 354.  Dr. Hitchcock diagnosed TBI and Cognitive Disorder NOS.  Tr. 358.  Neuropsychological test battery performances were described as "rather good."  Tr. 358.  Dr. Hitchcock noted that it was unknown to what extent pain medication and insomnia may have affected Dominick's test performance.  Id.  Dr. Hitchcock recommended that Dominick would "likely need a job that was fairly repetitive, [with] a job coach, and a memory tickler system to assist with learning job related activities.  Tr. 358-59.

    <u>Ms. Markarian.</u>  In November 2006, Dominick presented to Nurse Practitioner Sally Markarian.  Tr. 441.  Dominick reported a depressed mood, crying spells, poor sleep, and emotional lability.  Tr. 441.  He further reported that "he believes if he became eligible for social security his mood would improve."  Id.  He was diagnosed with Organic Affective Disorder secondary to traumatic head injury and was prescribed Lexapro.  Tr. 442.  In January 2007, Dominick returned to Ms. Markarian reporting that the Lexapro was helping to relieve some of his depression but he was still stressed due to lack of income and not hearing about his SSI/DIB claims.  Tr. 450, 460.  In February 2007, Dominick reported feeling more depressed due to being turned down for social security disability and stated again that he believed his depression would resolve once he got social security income.  Tr. 464.  On March 15, 2007, it

---

[2] Plaintiff only challenges the ALJ's findings with respect to his mental impairments.  Accordingly, only the medical evidence relating to his mental impairments is summarized herein.

was reported that Dominick's care was being handed over to Board Certified Advanced Practice Registered Nurse Tina Oney.  Tr. 469.

**Ms. Oney.**  On March 30, 2007, Dominick complained to Ms. Oney of continued depression but stated that he was not willing to take any new medications or change medications at that time.  Tr. 470.  Dominick was diagnosed with Organic Brain Syndrome and Depression NOS.  Tr. 471.  In April 2007 it was reported that Dominick had gone off Lexapro due to unpleasant side effects.  Tr. 478.  He reported that Elavil was helping him sleep.  Tr. 483.  Ms. Oney noted that Dominick did not want antidepressant medications and stated, "[H]is high level of anxiety and refusal to take medications other than Elavil are making it difficult to treat him." Id.  Dominick appeared very upset due to his physical disability evaluation.  Id.  In August 2007, Dominick returned to Ms. Oney and was irritable due to his social security appeal.  Tr. 521.  Ms. Oney stated that Dominick is "indecisive and very easily frustrated."  Tr. 522.  She encouraged him to return when he is able to decide whether he wants medications.  Id.  It does not appear that Dominick returned to Ms. Oney.

**Ms. Roll.**  Beginning in June 2007, Dominick began seeing Margaret Roll, LISW, MSSA, for regular individualized counseling.  Tr. 497-98, 502.  In August and September 2007, Ms. Roll reported that Dominick had an irritable, anxious, and labile mood.  Tr. 513, 525.  She also noted that he reported difficulty with attention and concentration.  Id.  In October 2007, Dominick reported he was better but still feeling depressed because of his situation.  Tr. 542.  He stated that his inability to work and support himself is a major factor in his depression.  Tr. 544. He reported that his mood was a 1-2 on a sale of 0-10 (with 10 being the best).  Tr. 545.

In January 2008, Dominick again reported his mood at a 1-2 out of 10.  Tr. 606.  In March 2008, Ms. Roll reported that Dominick was anxious and constricted.  Tr. 594, 599.  In

4

April 2008, Ms. Roll reported that Dominick was angry and ranting about "the system as a whole." Tr. 585. He stated that his mood was "up and down" and he found it easier to express himself through anger. Id. In June 2008, Ms. Roll reported that Dominick was easily frustrated and discouraged. Tr. 560. He reported that he felt helpless and felt that his problems were being minimized by various providers. Id. Dominick also reported continued depression and poor concentration. Tr. 568. Ms. Roll noted that Dominick discontinued his psychiatric medications and declined to take new medications. Tr. Id. In July 2008, Dominick reported that he was seeing psychiatrist Dr. Matthews from the Cleveland Clinic who started him out on Depakote. Tr. 637. In August and September 2008, Dominick reported he was doing better on the Depakote. Tr. 623, 631. Ms. Roll stated that his mood and affect seemed somewhat improved and less agitated. Id. In October 2008, it was reported that Dominick's Depakote increased and he was less irritable and less depressed. Tr. 681. In November 2008, Dominick stated that he was becoming more irritable and depressed since his Depakote had been increased. Tr. 678. Dominick stated that he felt better by the end of the counseling session. Id.

In January 2009, Dominick stated that he was in the best mood since starting treatment although he still gets "bummed out." Tr. 667. His concentration and attention span were noted as poor. Tr. 670. In February 2009, Dominick reported that he was depressed. Tr. 760. In March 2009, Dominick reported that, since his Depakote has been further increased, he was less depressed, calmer, and his sleep was improved. Tr. 756. In April 2009, Dominick stated that he felt helpless and hopeless after receiving an unfavorable determination from Social Security. Tr. 752. He rated his mood as a 4/10. Tr. 753. In May 2009, Dominick reported that he was doing "OK," was sleeping better, and was less edgy. Tr. 748. He rated his mood as an 8/10. Tr. 748. In August 2009, Dominick stated that Depakote was helping his mood and he was calmer, less

irrational.  Tr. 730.  In November 2009, Dominick presented to Ms. Roll tearful and depressed. He stated that his Depakote was further increased.  Tr. 707.

In January and March 2010, Dominick reported that his mood was "OK" but stated that he had been more depressed during the winter.  Tr. 695, 699.   In April 2010, Dominick stated that he no longer lashes out since starting Depakote but continues to experience episodes of sadness and depression.  Tr. 798.  Dominick also reported his attention and concentration were poor.  Id.  In 2010, it was noted that Dominick referenced his "neurotic paradox's [sic]."  Tr. 819, 822, 825, 833.  In November 2010, Dominick stated that he was taking his medication but it was not helping.  Tr. 803.  In March 2011, it was noted that Dominick had missed his last three counseling sessions due to severe weather.  Tr. 861.  He reported his depression as a 4/10.  Id.  In April 2011, Dominick reported difficulty concentrating and stated he could only concentrate on television for 20 minutes at a time.  Tr. 881.

### b.  Cleveland Clinic

On June 27, 2008, Dominick sought a second opinion from psychiatrist Dr. Manu Matthews at the Cleveland Clinic.  Tr. 649-652.   Dr. Matthews noted that Dominick was angry and paranoid about the treatment he received from Metro Health.  Tr. 649, 651.  Dr. Matthews diagnosed Dominick with Organic Brain Syndrome, Mood Disorder secondary to medical condition and Personality Disorder NOS.  Tr. 651.  He prescribed Depakote.  Id.

In August 2008, Dominick reported that Depakote calmed him down and his irritability was markedly improved but he continued to feel depressed.  Tr. 646.  It was recommended that he continued Depakote and start Cymbalta.  Tr. 647.  In December 2009, it was recommended that Dominick continue with the same dose of Depakote because his levels are good and he was doing much better.  Tr. 795.  It was noted that he continued to have "poor frustration tolerance"

but that it was "much improved from before." Id.   In March 2009, Dominick stated that he was

still sad from time to time.  Tr. 784.  In July 2009, Dominick reported that he felt depressed

because he was unable to be as physically active as he had been in the past.  Tr. 788.  In October

2009, it was reported that Dominick was doing "fairly well."  Tr. 791.

In January 2011, it was noted that Dominick's behavior was appropriate and brighter as

compared to previous visits but he reported ongoing anxiety and continued depressive episodes

lasting a few days.  Tr. 850-51.  It was recommended that Dominick continue Depakote and start

Celexa.  Tr. 852.   In April 2011, Dominick reported that he was still down at times but was

feeling better.  Tr. 888.

### 2.  Medical Opinion Evidence

**<u>Metro Health.</u>**   Dominick received three opinions from medical professionals at Metro

Health.  On April 30, 2007, Nurse Practitioner Tina Oney completed a mental medical source

statement ("MMSS") on Dominick's behalf.  Tr. 455-56.  Ms. Oney opined that Dominick has a

fair or poor ability to function in all workplace mental abilities.  Tr. 455-56.  Ms. Oney expressed

her opinion through X's on a form and did not provide additional explanation for her

determination.  Id.

On or after August 17, 2007,[3] both Ms. Oney and Dr. Karen Brocco, M.D.[4] signed a

mental functional capacity assessment opining that Dominic is "extremely limited" in all

workplace mental abilities.  Tr. 133, 487-88.   The opinion also noted:

> This person suffers from multiple head injuries with cognitive deficits, emotional
> dysregulation, and chronic depression with very minimal impulse control.  He is

---

[3] The opinion does not list a date on which it was signed.  Tr. 487-88.  The only date listed on the opinion is "Date of Last Exam" which is noted as August 17, 2007.  Tr. 488.  Accordingly, it can be assumed that the opinion was signed sometime on or after August 17, 2007.

[4] There are no treatment notes in the record from Dr. Brocco.

> extremely indecisive and has limited ability to complete a task without verbal assistance. He has emotional outbursts and difficulty with patience.  He is very repititious [sic] in his thinking patterns and has chronic underlying frustrations.

Tr. 488.

The third opinion is another mental medical source statement dated February 5, 2009, and signed by both social worker Margaret Roll and Dr. Brocco.  Tr. 686-87.  In the February 2009 opinion Dominick was rated at a fair or poor level of functioning in all workplace mental abilities, with the exception of his ability to maintain his appearance which was rated as good. Id.  It was noted that chronic depression, organic brain syndrome, labile mood, and obsessing make him unable to tolerate stress.  Tr. 687.  It was further noted that Dominick's daily level of function remains very limited to poor and that he was not employable.  Id.

**Consultative Exam – Dr. Felker.**  On October 16, 2006, Dominick attended a consultative examination with Sally Felker, Ph.D.  Tr. 401-405.  Dr. Felker diagnosed Dominick with Cognitive Mental Disorder NOS (with depressive symptoms noted); Mixed Substance Abuse in Remission; and Adult Antisocial Behavior.  Tr. 404.  Dr. Felker opined that Dominick is mildly restricted in his ability to concentrate but stated that his ability to "understand and follow one and two step tasks is not impaired."  Id.  She further opined that Dominick is mildly limited in his ability to relate to others and deal with the general public; and "mildly to possibly moderately" restricted in his ability to relate to work peers and supervisors and to tolerate the stress of employment because of cognitive limitations and depressive symptoms.  Id.

**State Agency Opinions.**  On October 23, 2006, state agency reviewing psychologist Melanie Bergsten, Ph.D., completed a psychiatric review technique and mental residual functional capacity.  Tr. 407-23.  Dr. Bergsten reviewed the evidence of record and determined

that Dominick does not meet Listing 12.02[5] for Organic Mental disorders.  Tr. 408.  Dr. Bergsten

opined that Dominick had mild limitations in his activities of daily living; moderate limitations

in maintaining social functioning; and moderate difficulties in maintaining concentration,

persistence, or pace.  Tr. 417.  Dr. Bergsten determined that Dominick's memory was "intact for

simple tasks."  Tr. 423.  She also opined that he can complete tasks without strict time quotas, in

a public setting and that he "can function in predictable settings at this time."  Id.

On February 17, 2007, state agency reviewing psychologist Karen Stailey-Steiger, Ph.D.,

also reviewed the record and affirmed the conclusions of Dr. Bergsten.  Tr. 661.

### C.  Relevant Testimonial Evidence

#### 1.      Dominick's Testimony

At the administrative hearing, Dominick was represented by counsel and testified that, on

a typical day, he watches television, takes care of his personal hygiene, and does household

chores.  Tr. 49.  Dominick stated that he has difficulty cleaning the tub due to pain.  Tr. 49-50.

He also stated he receives help grocery shopping.  Tr. 50.  Dominick testified he has back pain

from bulging discs that radiates down to his arm.  Tr. 51.  Dominick stated that he has problems

with balance and would fall off of a ladder.  Tr. 53-54.  He also testified that he sees a

psychiatrist at the Cleveland Clinic and counselor Margaret Roll at Metro Health for depression.

Tr. 51, 56-57.

#### 2.  Medical Expert's Testimony

Medical Expert Dr. Hershel Goren testified at the hearing.  Tr. 57-62.   Dr. Goren opined

that Dominick did not have a condition or combination of conditions that met or equaled a

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

Listing.  Tr. 57.  Dr. Goren further opined that Dominick had the following residual functional

capacity:

> Lift or carry 20 pounds occasionally, 10 pounds frequently.  No other exertional
> restrictions.  Never ladder, rope, or scaffold; never balance; occasional ramp or stairs;
> [occasional] stooping, kneeling, crouching, and crawling; occasional fingering with either
> hand; occasional feeling with the right hand.  No depth perception, because he's one-
> eyed.  Decreased field of vision to the left…No dangerous machinery, no unprotected
> heights, no workplace driving.  Noncomplex tasks, by which I mean more than simple
> one- and two-step routine, repetitive tasks.[6]

Tr. 58.  Dominick's attorney asked Dr. Goren to square his RFC finding with the opinion of Dr.

Brocco supporting extreme limitations in Dominick's mental functioning.  Tr. 59-60.  Dr. Goren

stated that there was nothing in the record that supported the extreme limitations assigned by Dr.

Brocco.  Tr. 60-61.  Dr. Goren summarized that the treatment notes from Metro Health were

inconsistent with the treatment notes from Cleveland Clinic.  Id.  ("To me, it looks like the

Cleveland Clinic people think [he's] doing great, and the Metro people think [he's] got real

problems.")  Dr. Goren opined that Dominick does not meet the B criteria of Listing 12.02.  Tr.

60, 62.

### 3. Vocational Expert's Testimony

Vocational Expert Mark Anderson ("VE") also testified at the hearing.  Tr. 63-70.  The

VE testified that Dominick's past work as a machine operator was performed at a medium level

of exertion and was a skilled occupation.  Tr. 63.  The ALJ then asked the VE whether there

were any jobs in the national or regional economy for a hypothetical individual of Dominick's

age, education, and work experience, who is male, right dominant, able to occasionally lift and

carry 20 pounds; frequently carry 10 pounds; walk, stand, and sit six out of eight hours a day; is

not limited in his ability to push/pull; should not use a left foot pedal but can frequently use a

---

[6] The ME clarified that noncomplex tasks meant that Dominick could perform more than simple routine work but
not highly complex tasks.  That Dominick could perform noncomplex tasks "consistent with his educational
accomplishments."  Tr. 58.

right foot pedal; can occasionally use ramps or stairs, but never a ladder, rope, or a scaffold; never balance; can occasionally stoop, kneel, crouch, and crawl; no limits on handling or reaching but is limited to occasional bilateral fingering and occasional right feeling; no work which requires binocular vision or depth perception; no extensive reading on a frequent basis; should avoid hazards such as unprotected heights, slippery or uneven surfaces, and driving; can perform simple, routine one to two-step tasks in a low-stress environment with no high production quotas and no piece rate work.  Tr. 63-64.   The VE stated that such a hypothetical individual would be able to perform work as a housekeeper (916,000 national jobs; 38,000 Ohio jobs; 7,500 Northeast Ohio jobs).  Tr. 64-65.

Dominick's attorney then asked the VE if the housekeeping job would be affected by a further limitation requiring that the hypothetical individual could not have a job with vibrations. Tr. 66.  The VE responded that the housekeeping job would still be available with that additional limitation.  Id.  Dominick's attorney then asked what effect a further limitation of only four hours of standing and walking would have on the available jobs.  Tr. 67.  The VE testified that the housekeeping job would be eliminated with a four hour standing/walking limitation.  Id.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920[7]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

---

[7] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his December 28, 2011, decision, the ALJ made the following findings:

1.      The claimant meets the insured state requirements of the Social Security Act (the "Act") through December 31, 2006.  Tr. 23.

2.      The claimant has not engaged in substantial gainful activity since May 24, 2006, the alleged onset date.  Tr. 23.

3.      The claimant has the following severe impairments:  disorders of the back, discogenic and degenerative; carpal tunnel syndrome; organic mental disorder; and he is blind in the left eye.  Tr. 23.

4.      The claimant does not have an impairment or combination of impairments that met or medically equaled the severity of the one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 23.

5.      The claimant has the residual functional capacity ("RFC") to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b).  Specifically, he can lift/carry 20 pounds occasionally and 10 pounds frequently.  He can walk for 6 hours of an 8-hour work day.  He can stand for 6 hours of an 8-hour work day.  He can sit for 6 hours of an 8-hour work day.  He can push/pull.  He cannot operate a left foot pedal but can frequently operate a right foot pedal.  He can occasionally climb ramps or stairs but can never claim ladders, ropes, or scaffolds.  He cannot balance.  He can occasionally stoop, crouch, kneel, or crawl.  He can reach and handle without limitation but fingering is limited to occasionally bilaterally, and only occasional feeling with the right hand. He is functionally blind in the left eye with a decreased field of vision on the left.  The work cannot involve binocular vision, depth perception, no extensive reading on a frequent basis, and no reading of small print on a frequent basis.  He should avoid hazards, unprotected heights, slippery or uneven surfaces, and he cannot drive.  He can perform simple, routine tasks that are one or two steps.  The work must be low stress meaning no high production quotas or piece rate work.  Tr. 25.

6.      The claimant is unable to perform any past relevant work.  Tr. 33.

7.     The claimant was born [in 1961] and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age.  Tr. 33.

8.     The claimant has at least a high school education and is able to communicate in English.  Tr. 33.

9.     Transferability of job skills is not material to the determination of disability as using the Medical-Vocational rules as a framework supports a finding that claimant is "not disabled," whether or not he has transferable job skills.  Tr. 34.

10.    Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform.  Tr. 34.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 24, 2006, the alleged onset date, through the date of this decision.  Tr. 34.

## V. Parties' Arguments

Dominick presents two issues for review.  First, he argues that the ALJ failed to abide by the treating physician rule by failing to provide "good reasons" for rejecting the opinions of Dr. Brocco, Tina Oney, and Margaret Roll.  Doc. 18, pp. 10-15.  Second, Dominick argues that the ALJ erred by failing to find that Dominick met the requirements of Listing 12.02 Organic Mental Disorders.  Id. at pp. 15-18.  In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence.  Doc. 19, pp. 8-15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

14

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d

679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*,

nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745

F.2d 383, 387 (6th Cir. 1984).

**A.  The ALJ did not violate the treating physician rule**

Dominick argues that the ALJ violated the treating physician rule by failing to provide

"good reasons" for rejecting the opinions of Dr. Brocco, Tina Oney, and Margaret Roll.  Doc. 18,

pp. 10-15.  Under the treating physician rule, opinions of treating sources must be given

"controlling weight" if: (1) the opinion "is well-supported by medically acceptable clinical and

laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other

substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).  *Wilson v. Comm'r of Soc.*

*Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The regulations require the ALJ to "always give good

reasons in [the] notice of determination or decision for the weight" given to the claimant's

treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be "supported by

the evidence in the case record, and must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight." Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *5.  The Sixth Circuit has

held that an ALJ's failure to follow the "good reasons rule" by identifying the reasons for

discounting the opinions and explaining precisely how those reasons affected the weight given

"*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified

based upon the record." *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406-07 (6th Cir. 2009) (*citing Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007)).

There are three opinions at issue which are described below.  The first is an April 30, 2007, opinion signed by Tina Oney, Advanced Practice Registered Nurse, Board Certified, in which Ms. Oney opines that Dominick has a fair or poor ability to function in all workplace mental abilities.  Tr. 455-56.   The second opinion is signed[8] by both Ms. Oney and Dr. Brocco. In it, they opine that Dominic is "extremely limited" in all workplace mental abilities.  Tr. 487-88.   The third opinion is dated February 5, 2009, and signed by both Margaret A. Roll, licensed social worker, and Dr. Brocco.  Tr. 686-87.  In that opinion Dominick was rated at a fair or poor level of functioning in all workplace mental abilities, with the exception of his ability to maintain his appearance, which was rated as good.  Id.

The ALJ assigned little or no weight to the opinions of Dr. Brocco, Ms. Oney, and Ms. Roll.  Tr. 31-32.  The ALJ pointed out that Ms. Oney's April 2007 opinion provided no medical or clinical findings to support her assessment.  Tr. 31.  With regard to the opinion signed by Ms. Oney and Dr. Brocco, the ALJ stated that this opinion was inconsistent with the evidence as a whole, including reports of Dominick's daily activities, which provide support for the determination that he can perform simple, routine tasks.  Id.  Finally, as to the February 2009 opinion signed by Ms. Roll and Dr. Brocco, the ALJ found that this opinion was again inconsistent with evidence that showed that Dominick's mood, irritability, and poor frustration tolerance improved significantly with Depakote.  Tr. 32.

---

[8] As noted above, the opinion does not list a date on which it was signed.  Tr. 487-88.  The only date listed on the opinion is "Date of Last Exam" which is noted as August 17, 2007.  Tr. 488.  Accordingly, it can be assumed that the opinion was signed sometime on or after August 17, 2007.

To judge compliance with the treating source rule, we first determine if any of those three providers are treating sources. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (6th Cir.2007)). A treating source is an *acceptable medical source* who provides, or has provided, a claimant with medical treatment or evaluation and who has had an *ongoing treatment relationship* with the claimant. 20 C.F.R. § 404.1502 (emphasis added). The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  Id.  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once . . . ."  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). In those instances where a physician is not a treating source, *Wilson* has been found to be inapplicable. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *see also Kornecky*, 167 Fed. Appx. at 507; *see also Daniels v. Comm'r of Soc. Sec.*, 152 Fed. Appx. 485, 490 (6th Cir. 2005).

The agency's regulations limit treating sources to "acceptable medical sources."  20 C.F.R. § 404.1502.  The definition of "acceptable medical sources" does not include social workers or nurse practitioners.  20 C.F.R. § 404.1513(d)(1) (explaining that a nurse practitioner is not acceptable medical source); *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 819 (N.D. Ohio 2009) (citing SSR 06-03p) (stating that licensed clinical social workers are "other

sources" who are not acceptable medical sources).  Thus, Ms. Oney and Ms. Roll are not acceptable medical sources and are not treating sources under the regulations.

On the other hand, Dr. Brocco is an acceptable medical source.  20 C.F.R. §404.1513(a). However, this does not end the inquiry.  A treating source must also have had "an ongoing treatment relationship with the claimant."  20 C.F.R. § 404.1502.  Medical expert Dr. Goren testified that there were no treatment records from Dr. Brocco.  Tr. 92-93.  Further, this Court's review of the record similarly reveals no treatment records from Dr. Brocco.  Thus, Dr.  Brocco was not in a position "to provide a detailed, longitudinal picture of [Dominick's] medical impairment(s)." *Kornecky*, 167 F. App'x at 506; See 20 C.F.R. §§ 404.927(c)(2)(i), 416.927(c)(2)(i) (defining a treating physician as one who "has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment").  As Dr. Brocco's relationship with Dominick did not rise to the level of an ongoing treatment relationship, Dr. Brocco was not a treating source under the regulations.

Since Ms. Oney, Ms. Roll, and Dr. Brocco are not treating sources under the regulations, the ALJ did not violate the treating physician rule.  *Murray v. Comm'r of Soc. Sec.*, 1:13-CV-215, 2013 WL 5428734 (N.D. Ohio Sept. 26, 2013) ("the procedural 'good reasons' requirement does not apply to non-treating physicians."); *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (explaining that "[i]mportantly ... this reasons giving requirement exists only for § 404.1527(d)(2), and not for the remainder of § 404.1527" and concluding: "[i]n the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not accepting their reports").  Therefore, Dominick's argument that the ALJ violated the treating physician rule is without merit.

**B.  The ALJ's determination that Dominick does not meet Listing 12.02 is supported by substantial evidence**

Dominick next argues that the ALJ failed to properly evaluate his claim under Listing

12.02.  Doc. 18, pp. 15-18.  Dominick argues that he met both the A and B criteria under Listing

12.02.  Id.  Listing 12.02(A) and (B) provide:

Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied....

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

1. Disorientation to time and place; or
2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
3. Perceptual or thinking disturbances
4. Change in personality; or
5. Disturbance in mood; or
6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

The ALJ specifically considered Listing 12.02 and determined that Dominick does not meet the

paragraph B criteria.  Tr. 23- 24.  The ALJ determined that Dominick did not meet the

"paragraph B" criteria because the ALJ concluded that Dominick has only mild difficulties in his activities of daily living and maintaining social functioning and only moderate difficulties in maintaining concentration, persistence, or pace.  Tr. 24.  The ALJ also found that Dominick experienced no episodes of decompensation of an extended duration.  Id.

Dominick asserts that the opinions of Dr. Brocco, Ms. Oney, and Ms. Roll support a finding of marked limitation in the areas of social functioning and concentration, persistence, and pace.  Doc. 18, p. 17.  The following substantial evidence supports the ALJ's determination that Dominick did not have marked limitations in the areas of social functioning and concentration, persistence, and pace:  the opinions of Dr. Goren, Dr. Felker, Dr. Bergsten, and Dr. Stailey-Steiger; treatment notes from the Cleveland Clinic; and Dominick's reported daily activities.

**Opinions of Dr. Goren, Dr. Felker, Dr. Bergsten, Dr. Stailey-Steiger.**  The ALJ gave considerable weight to the opinions of Dr. Goren, Dr. Felker, Dr. Bergsten, and Dr. Stailey-Steiger.[9]  Tr. 31, 33.  All four of these sources found that Dominick exhibited no greater than moderate limitations in the areas of social functioning and concentration, persistence, and pace.  The consultative examiner, Dr. Felker, opined that Dominick was only mildly limited in his ability to concentrate and in his ability to relate to others and deal with the general public.  Tr. 404.  She found his ability to relate to work peers and supervisors and to tolerate the stress of employment was mildly to moderately limited because of cognitive limitations and depressive symptoms.  Id.  She concluded that Dominick retained the mental ability to "understand and follow instructions for one to two step tasks."  Tr. 404.

---

[9] With regard to Dr. Goren, the ALJ stated that he gave considerable weight to the opinion of Dr. Goren with one exception.  Tr. 33.  Dr. Goren found that, in addition to simple, routine tasks, Dominick retained the capacity to perform "noncomplex tasks," defined as "more than simple one- and two-step routine, repetitive tasks." Tr. 58.  The ALJ found that other evidence in the record did not support this conclusion by Dr. Goren. Tr. 33.

ME Dr. Goren and state agency reviewing psychologist Dr. Bergsten specifically reviewed Listing 12.02 and determined that Dominick did not meet the requirements for that Listing.  Tr. 62, 408.  Dr. Goren specifically stated that Dominick does not meet the paragraph B criteria.   Tr. 62.   Dr. Goren and Dr. Bergsten also opined that Dominick retained the capacity for simple tasks without time or production quotas.  Tr. 58, 423.  Dr. Bergsten found that Dominick was moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace.  Tr. 417.  State agency reviewing psychologist Dr. Stailey-Staiger confirmed the opinion of Dr. Bergsten.  Tr. 661.

**Cleveland Clinic Treatment Notes.**  The ALJ also correctly noted that psychological treatment notes from Dominick's treating psychiatrists at the Cleveland Clinic showed improvement in Dominick's mental health impairments.  Tr. 30.  Psychiatrist Dr. Manu Matthews diagnosed Dominick with Organic Brain Syndrome, Mood Disorder secondary to medical condition, and Personality Disorder NOS.  Tr. 651.  He prescribed Depakote.  Id.  While on Depakote, although noting he felt depressed at times, the Cleveland Clinic treatment records generally reflected improvement in Dominick's mood, irritability, and frustration tolerance.  Tr. 646, 791, 795, 850-51, 888.  Dominick's treating psychiatrists at the Cleveland Clinic did not assess any mental functional limitations.

**Daily Activities.**  The ALJ further noted that Dominick lives alone without assistance, takes care of his personal needs, performs household tasks, attends to his personal care, shops, and takes the bus to appointments.  Tr. 24, 31.  The ALJ also stated that there is evidence that Dominick's lack of employment is due to reasons other than his physical or mental health.  Tr. 28.  He noted that Dominick maintained employment as a machine operator from 1996 through 2001 despite having most of the impairments that he now alleges.  Id.

Based on all of the above, substantial evidence supports the ALJ's determination that Dominick did not meet Listing 12.02.  More particularly, substantial evidence supports a finding that Dominick does not exhibit marked limitations in the areas of social functioning and concentration, persistence, or pace.  Thus, Dominick's argument to the contrary is without merit.

Dominick counters that the treatment notes and opinions of Dr. Brocco, Ms. Oney, and Ms. Roll establish the 12.02B criteria.  Doc. 18, p. 17.  First, as explained in the prior section, there are no treatment notes from Dr. Brocco in the record.  Next, the ALJ gave little to no weight to the findings of Dr. Brocco, Ms. Oney, and Ms. Roll.  Tr. 31-32.  The ALJ gave specific examples for his assignment of weight supported by the evidence in the record.   For example, the ALJ noted that, although Ms. Oney and Dr. Brocco opined that Dominick has a limited ability to complete a task without verbal assistance, Dominick's reported daily activities (as noted above) support the determination that Dominick can perform simple, routine tasks.   Tr. 31.  With regard to social functioning, the ALJ found that Ms. Roll and Dr. Brocco's opinion that Dominick was unable to tolerate stress was inconsistent with the treatment notes from the Cleveland Clinic doctors who noted that Dominick's mood, irritability, and poor frustration tolerance improve significantly with Depakote.  Tr. 32.

As noted above, substantial evidence supports the Commissioner's decision that Dominick does not meet Listing 12.02.  As long as substantial evidence supports the Commissioner's decision, the Court must defer to it " 'even if there is substantial evidence in the record that would have supported an opposite conclusion....' " *Wright v. Massanari,* 321 F.3d 611, 614 (6th Cir.2003) (quoting *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997)).  Thus, Dominick's argument that the ALJ failed to properly evaluate him under Listing 12.02 is without merit.

### VII. Conclusion

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

Dated: July 23, 2014

Kathleen B. Burke
United States Magistrate Judge